John T. RISENHOOVER, Plaintiff,

v.

Mark ENGLAND; Cox Texas Publications, Inc.; Cox Enterprises, Inc.; KWTX Broadcasting Company, and Rural/Metro Corporation of New Mexico—Texas d/b/a American Medical Transport, Defendants.

Leslie McKEEHAN, Individually and as Representative of the Estate of Todd W. McKeehan, Plaintiffs,

Cynthia Williams, Individually and as Representative of the Estate of Robert J. Williams, Intervenors,

Tony G. McKeehan and Patsy McKeehan, Intervenors,

James T. Williams and Patricia Williams, Intervenors,

v.

Mark ENGLAND; Cox Texas Publications, Inc.; Cox Enterprises, Inc.; KWTX Broadcasting Company, and Rural/Metro Corporation of New Mexico—Texas d/b/a American Medical Transport, Defendants.

Paige Robertson LeBLEU, Individually and as Natural Mother, Next Friend and Tutrix of Cameron Wayne LeBleu; Susan Carrico Kuntz, as Natural Mother, Next Friend and Tutrix of Scott Henry LeBleu; John Henry LeBleu, Sr., and Majory W. LeBleu, Plaintiffs,

v.

COX TEXAS PUBLICATIONS, INC., Cox Enterprises, Inc., KWTX Broadcasting Company and Rural/Metro Corporation of New Mexico—Texas, d/b/a American Medical Transport, Defendants.

Robert RODRIGUEZ, Plaintiff,

v.

COX TEXAS PUBLICATIONS, INC.; Cox Enterprises, Inc.; KWTX Broadcasting Company; and Rural/Metro Corporation of New Mexico–Texas, d/b/a American Medical Transport, Defendants.

Danny Jack CURTIS, Walter Glen Jordan, and Peter B. Mastin, Plaintiffs,

Ward Clayton Alexander, III, et al., Intervenors,

Constance Barron, et al., Intervenors,

v.

COX TEXAS PUBLICATIONS, INC.; Cox Enterprises, Inc.; KWTX Broadcasting Company; and Rural/Metro Corporation of New Mexico–Texas, d/b/a American Medical Transport, Defendants.

Roland BALLESTEROS, Keith Constantino, Eric Evers, Mark Handley, Claire Rayburn, and Larry Shiver, Plaintiffs,

v.

COX TEXAS PUBLICATIONS, INC.; Cox Enterprises, Inc.; KWTX Broadcasting Company; and Rural/Metro Corporation of New Mexico—Texas, d/b/a American Medical Transport, Defendants.

John Cecil WILLIS, and Evelyn Lorraine Willis, Individually and as Representatives of the Estate of Steven David Willis, Plaintiffs,

v.

COX TEXAS PUBLICATIONS, INC.; Cox Enterprises, Inc.; KWTX Broadcasting Company; and Rural/Metro Corporation of New Mexico—Texas, d/b/a American Medical Transport, Defendants.

Phillip CHOJNACKI, Plaintiff,

v.

Mark ENGLAND; Cox Texas Publications, Inc.; Cox Enterprises, Inc.; KWTX Broadcasting Company, and Rural/Metro Corporation of New Mexico—Texas d/b/a American Medical Transport, Defendants.

Charles SARABYN, Plaintiff,

v.

Mark ENGLAND; Cox Texas Publications, Inc.; Cox Enterprises, Inc.; KWTX Broadcasting Company, and Rural/Metro Corporation of New Mexico—Texas d/b/a American Medical Transport, Defendants.

Davy AGUILERA, Plaintiff,

v.

COX TEXAS PUBLICATIONS, INC.; Cox Enterprises, Inc.; KWTX Broadcasting Company; and Rural/Metro Corporation of New Mexico—Texas, d/b/a American Medical Transport, Defendants.

Civil Nos. W–93–CA–138, W–94–CA–082, W–94–CA–089, W–94–CA–157, W–94–CA–196, W–95–CA–027, W–95–CA–056, W–95–CA–060, W–95–CA–061, and W–95–CA–065.

United States District Court,
W.D. Texas,
Waco Division.

April 2, 1996.

James R. Dunnam, Damon L. Reed, Dunnam & Dunnam, LLP, Waco, Texas, for Risenhoover, Tony G. McKeehan, James T. Williams, LeBleu, Rodriguez, Willis.

Minor L. Helm, Jr., P.M. Johnston, Sleeper, Johnston & Helm, P.C., Waco, Texas, James A. Treanor, III, David E. Mills, Timothy J. O'Rourke, Jonathan D. Hart, Sean D. Hughto, Dow, Lohnes & Albertson, Washington, DC, for Mark England, Cox Texas Publications, Inc., Cox Enterprises, Inc.

Frederick D. Bostwick, III, Naman, Howell, Smith & Lee, Waco, Texas, for KWTX Broadcasting Company.

Noley R. Bice, Jr., Donald Keith Dorsett, Fulbright, Winniford, Bice & Davis, Waco, Texas, Marshall W. Anstandig, Mark I. Harrison, Bryan Cave, Phoenix, Arizona, for Rural/Metro Corporation of New Mexico–Texas d/b/a American Medical Transport.

John W. Stevenson, Jr., Robert E. Ammons, Houston, Texas, for Leslie McKeehan in Civil No. W–94–CA–082.

Robert E. Ammons, Houston, Texas, for Cynthia Williams in Civil No. W–94–CA–082.

Joe C. Tooley, Bradley M. Gordon, McCauley, Macdonald, Love & Devin, Dallas, Texas, for Danny Curtis, Walter Glen Jordan, Peter B. Mastin.

Broadus Autry Spivey, Richard Alan Grigg, Spivey, Grigg, Kelly & Knisely, P.C., Austin, Texas, for Roland Ballesteros, Keith Constantino, Eric Evers, Mark Handley, Claire Rayburn and Larry Shiver.

Michael E. St. John, Stevenson, Parker & St. John, Houston, Texas, for Phillip J. Chojnacki and Charles Sarabyn.

Noley R. Bice, Donald Keith Dorsett, Fulbright, Winniford, Bice & Davis, Waco, Texas, for KWTX Broadcasting Company in Civil No. W–95–CA–065.

Marshall W. Anstandig, Mark I. Harrison, Bryan Cave, Phoenix, Arizona, P.M. Johnston, Minor Helm, Sleeper, Johnston & Helm, P.C., Waco, Texas, James A. Treanor, III, David E. Mills, Timothy J. O'Rourke, Jonathan D. Hart, Sean D. Hughto, Dow, Howell, Smith & Lee, Waco, Texas, Frederick D. Bostwick, III, Naman, Howell, Smith & Lee, Waco, Texas, Noley R. Bice, Donald Keith Dorsett, Fulbright, Winniford, Bice & Davis, Waco, Texas, for Rural/Metro Corporation of New Mexico–Texas, d/b/a American Medical Transport in Civil No. W–95–CA–065.

## MEMORANDUM OPINION AND ORDER

WALTER S. SMITH, Jr., District Judge.

In this wrongful death action, Plaintiffs assert causes of action based upon negligence, breach of contract, intentional infliction of emotional distress, interference with and/or obstruction of a law enforcement officer in the performance of his official duties, and conspiracy. All Defendants move for summary judgment based upon two major issues: (1) Defendants' actions were neither a proximate cause nor a cause in fact of any of the injuries suffered by Plaintiffs; and (2) the actions of the media Defendants are protected by the First Amendment, which immunizes them from a suit for damages. The newspaper Defendants additionally move for summary judgment as to Plaintiffs' other claims.[1] Having reviewed the parties' briefs, motions and summary judgment proof, the Court is persuaded the Motions for Summary Judgment filed by Defendants KWTX Broadcast Company and Rural/Metro Corporation of New Mexico—Texas, d/b/a American Medical Transport should be denied, the Motion for Summary Judgment filed by Defendant Cox Enterprises, Inc. and Cox Texas Publi-

---

1. Plaintiffs assert they have not abandoned any theories of liability, as suggested in the newspaper Defendants' reply brief. Plaintiffs contend they have replied to each issue raised in the newspaper Defendants' motion for summary judgment and that they are not required to respond to issues not properly raised. A review of the newspaper Defendants' motion reveals that summary judgment has been properly requested as to each claim asserted by Plaintiffs.

cations, Inc. should be partially granted, and the Motion for Summary Judgment filed by Defendant Mark England should be granted.

## I. BACKGROUND

This action arises out of the tragic events that occurred at the Mount Carmel religious center, located outside of Waco, Texas. Plaintiffs are agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF") (or their surviving family members) who were injured during the attempted execution of search and arrest warrants at Mount Carmel on the morning of February 28, 1993. Defendants are the media organizations which covered the event and were already at the scene when the ATF agents arrived, and an ambulance service that ATF had contacted to be on stand-by in case of injuries on the morning of the raid. The Plaintiffs assert that each of the Defendants, either directly or indirectly, caused their injuries by alerting the inhabitants of Mount Carmel of the impending raid. The majority of the underlying facts are not in dispute:

In the 1930's, a splinter group of the Seventh Day Adventist Church, known as the Branch Davidians, re-located to Waco from California under the guidance of a self-styled prophet named Victor Houteff. Houteff's wife Florence assumed the leadership of the sect after his death, and prophesied that the end of the world, as foretold in the Bible's Book of Revelations, would commence on April 22, 1959. Her prediction was unfulfilled, and many members abandoned the group. A small group of followers remained in Waco under the leadership of Benjamin Roden, who was succeeded by his wife, Lois. The group eventually moved out of the Waco city limits, and established a commune-type community, known as Mount Carmel, near the small community of Elk.[2]

A young man named David Koresh ("Koresh"), then known as Vernon Howell, joined the group in 1984, and soon became em-

broiled in a struggle for leadership with Lois Roden's son, George ("Roden"). It was during this period that the 24-year-old Koresh married his legally acknowledged wife, a 14-year-old girl by the name of Rachel Jones, who was the daughter of Perry Jones, a prominent member of the sect. In 1985, Koresh and his followers were ejected from Mount Carmel at gunpoint. Koresh led them to the Angelina National Forest near Palestine, Texas, where they lived in plywood boxes, tents and converted school buses. During this period, Koresh declared himself a religious leader and prophet, preaching his allegedly divinely revealed interpretation of the Seven Seals in the Bible's Book of Revelations, which foretell the end of the world.

While Koresh's religious teaching did not focus on the "Golden Rule," it did focus on para-military training. Koresh armed his followers and led them on a raid of the Mount Carmel complex in 1987. Roden was injured during the resulting shoot-out, and Koresh and his followers were arrested and tried for attempted murder. All of Koresh's followers were acquitted, while the jury was unable to reach a verdict as to the charges against Koresh.

Subsequent to the trial in 1989, Roden was arrested in Odessa, Texas for murder in an unrelated case. He was tried and found not guilty by reason of insanity, and was committed to a state mental hospital. Koresh was then free to set himself up as undisputed leader of the Davidians at Mount Carmel. In 1990, he changed his name legally to David Koresh after another revelation from God. He also began recruiting new members in other American cities, as well as in Australia and Great Britain. The ramshackle outbuildings that once made up the Mount Carmel community were consolidated into a large complex, which included living quarters, a chapel, a gymnasium, as well as lookout towers and an armory. Defendants' Exhibit 4. The fort-style building was a reflection of Koresh's apocalyptic mentality and preaching—the end of the world was near and would be brought about by "the Beast" or "the Babylonians," which he identified as

2. Various witnesses refer to the site as "Roden-

ville," "Mount Carmel," or "the Compound."

agents of the Government, particularly the ATF. To that end, the Davidians stockpiled food and water, clothing, and weapons, and conducted military-style training. The weapons the group collected included hand-grenades and other explosives, as well as illegal automatic weapons and the parts necessary to illegally convert semi-automatic weapons to fully automatic. This illegal weaponry came to the attention of the ATF, which began an investigation of the cult in 1992.

In his teachings, the false prophet began to identify himself as the born-again Messiah who could somehow cleanse his followers of sin by committing those sins himself. Koresh's role as a "messiah" included exclusive access to all female followers above the age of twelve, including the wives and daughters of his male disciples. Allegations of child-abuse arose when Koresh's custom of "marrying" girls as young as twelve was revealed during a child custody hearing in Michigan involving one of his followers, Sherri Jewell. These charges attracted the attention of the media, both foreign and domestic. The Waco Tribune–Herald [3] ("the newspaper" or "the Trib") began an in-depth investigation of the cult, which came to the attention of the ATF sometime in late 1992 or early 1993.[4]

During December 1992, the ATF instituted plans to obtain and execute an arrest warrant for Koresh and a search warrant for the Mount Carmel Center. Testimony of Bill Buford, dated January 25, 1994 ("Buford TR") [5] at 27, 107–109, 113. The planning and execution of the raid were in the hands of Phillip Chojnacki ("Chojnacki") (the Incident Commander) and his immediate subordinate Chuck Sarabyn ("Sarabyn") (the Tactical Coordinator). The decision was made to conduct a "dynamic" entry into the Compound, which depended on the element of surprise for its success. Testimony of Danny Curtis, dated January 19, 1994 ("Curtis TR") at 95; Testimony of Roland Ballesteros, dated January 18–19, 1994 ("Ballesteros TR") at 85; Testimony of Ward Clayton Alexander III, dated January 21, 1994 ("Alexander TR") at 43; Testimony of Barbara Maxwell, dated January 21, 1994 ("Maxwell TR") at 30. The element of surprise was necessary in order to reduce, or prevent, the possibility of injuries to those involved—Davidians as well as agents. Buford TR at 98; Ballesteros TR at 158. ATF Director Stephen Higgins ("Higgins") ordered the field commanders to cancel the operation if they learned that the secrecy of the raid had been compromised. Testimony of ATF Director Stephen Higgins before the Subcommittee on the Treasury, Postal Service and General Government Appropriations of the House Appropriations Committee ("Higgins Test."), dated June 9, 1993, at 60, 74.

In January 1993, the ATF set up an undercover operation in a house across from the Compound.[6] Plaintiff Robert Rodriguez ("Rodriguez") was one of the agents assigned to the undercover house. The agents' job was to infiltrate the Compound and discover as much as possible about its physical layout and the habits of its residents. Rodriguez visited the Compound a number of times over the next few weeks, managing to establish a relationship of sorts with Koresh. Rodriguez TR at 6–7, 78, 90, 110–11, 113–14, 132.[7]

---

**3.** The Waco Tribune–Herald is a newspaper published each morning in Waco by Defendant Cox Texas Publications, Inc. Defendant Cox Enterprises, Inc. is the ultimate parent company of Cox Texas Publications, Inc.

**4.** The newspaper's plans to publish the series were apparently not a secret. Koresh knew that an article was to be published. Deposition of Brian Blansett ("Blansett Dep.") at 72. Newspaper reporter Tommy Witherspoon informed KWTX cameraman Dan Mulloney of the series two to three weeks before its publication. Deposition of Dan Mulloney ("Mulloney Dep.") at 67.

**5.** References to "TR" are to transcripts of testimony at the criminal trial in *United States v.*

*Branch, et al.,* Criminal Action No. W–93–CR–046.

**6.** The road separating the Compound from the undercover house has been referred to as EE Ranch Road and Double EE Ranch Road. For clarity, the Court will use Double EE Ranch Road. Geographically, Double EE Ranch Road runs in front of the Compound and intersects with Farm-to-Market Road 2491 ("FM 2491") and Old Mexia Road.

**7.** Later testimony at the criminal trial would reveal that the Davidians were suspicious of the undercover agents who appeared too old to be the TSTC students they pretended to be.

During this month, officials at the newspaper contacted the corporate offices of Defendant Cox Enterprises, Inc. ("Cox") regarding concerns over staff security that might occur when the Davidian story was published. Deposition of Charles Rochner ("Rochner Dep.") at 24–25. The newspaper feared that the Davidians might retaliate against its employees because of the publication of the articles on Koresh.[8] Through its investigation, the newspaper had learned what the ATF had discovered—that the Davidians had accumulated a number of weapons, including semi-automatic rifles converted with "hellfire" switches (a device that enables a semi-automatic to be fired rapidly without actually converting it to fully automatic), .50 caliber guns, and possibly fully automatic weapons. Blansett Dep. at 180; Deposition of Mark England ("England Dep.") at 50. Charles Rochner ("Rochner"), the Vice–President of Corporate Security for Cox, was assigned to evaluate security at the Waco newspaper offices. At his suggestion, various measures were taken including removing identifying stickers from newspaper vehicles, restricting access to various parts of the building, and hiring additional security guards. Deposition of Randy Preddy ("Preddy Dep.") at 28–29; Deposition of Rod Aydelotte ("Aydelotte Dep.") at 87.[9]

Rochner contacted Tom Stokes, the ATF Special Agent in Charge ("SAC") in Atlanta regarding possible ATF investigations into the Davidians. Defendants' Exhibit 5, Defendants' Responses to Plaintiff Danny Curtis' Interrogatories ("Curtis Int.") at 6. Rochner was told that Chojnacki was in charge of the investigation and that ATF had a March 1, 1993 "target date." Id. Rochner next contacted Chojnacki, who confirmed that a raid was scheduled for March 1. Rochner Dep. at 56–57. Chojnacki requested Rochner not to tell anyone at the newspaper about the impending raid, and asked for his assistance in delaying publication of the "Sinful Messiah" series. Id.

On February 1, 1993, Sarabyn and ATF agent Earl Dunagan met with Barbara Elmore ("Elmore"), the newspaper's managing editor, at the United States Attorney's Office in Waco. Deposition of Barbara Elmore ("Elmore Dep.") at p. 13. Sarabyn and Dunagan requested that the newspaper delay publication of their series on Koresh because of the pending criminal investigation and proposed warrant execution. Id. Sarabyn and Dunagan told Elmore that the ATF investigation would eventually culminate in the execution of search and arrest warrants, but that they could not confirm exactly when this activity would occur. Elmore Dep. at 14. The agents were concerned that publication of the articles on Koresh would upset him and possibly cause him to increase patrols and security around the Compound. Elmore Dep. at 13; Affidavit of Philip J. Chojnacki ("Chojnacki Aff."). Elmore declined to delay publication. Elmore Dep. at 17.

During the early part of February, Jimmy Glover, the Waco office supervisor for Defendant Rural/Metro Corporation of New Mexico—Texas d/b/a American Medical Transport ("AMT"), received inquiries regarding the availability of AMT's ambulance services for a law enforcement operation in the area. Deposition of Jimmy Glover ("Glover Dep.") at 16–19. Glover learned on February 16 that the law enforcement agency involved was the ATF. Id.

Another meeting between the ATF and the newspaper was scheduled for the afternoon of February 24. Curtis Int. at 7; Preddy Dep. at 55–57; Elmore Dep. at 28–29; Rochner Dep. at 71–73. Present at this meeting were Chojnacki, Rochner, Preddy, Elmore, Robert Lott (editor of the newspaper), and Brian Blansett (city editor). Id. Chojnacki once again requested that the newspaper delay publication of the series on Koresh. However, he would not inform the newspaper exactly when the ATF operation would occur or even acknowledge that an operation would occur at all. He further indicated that if there were an operation, it would not be on

---

**8.** The series of articles was entitled "The Sinful Messiah," and was written by Mark England and Darlene McCormick.

**9.** The fear of retaliation was so high that on the day the series was first published, England and McCormick checked into motels rather than remain in their own homes. England Dep. at 47; Blansett Dep. at 86–87; Preddy Dep. at 35.

March 1. Rochner Dep. at 73. Chojnacki refused to commit to a date ostensibly because the ATF had not yet obtained the search or arrest warrants and had no guarantee that the requests for the warrants would be granted. The newspaper again declined to delay publication. Preddy Dep. at 55–57; Elmore Dep. at 28–29; Rochner Dep. at 71–73. Chojnacki was not told when the articles would be published because the final decision had not yet been made. Preddy Dep. at 57. Preddy agreed to inform Chojnacki when the articles would be published prior to the date of publication. Preddy Dep. at 67.

On the same day, one of the newspaper's reporters, Tommy Witherspoon ("Witherspoon"), received a tip that an ATF operation would be conducted at the Compound on March 1. Blansett Dep. at 63; Curtis Int. at 8. He informed his superiors of the tip. Also on this same day, ATF agents began arriving at Fort Hood [10] to prepare for the execution of the warrants at the Compound which, at that time, was scheduled to occur on Monday, March 1. Buford TR at 114; Ballesteros TR at 75–78, 81; Testimony of Eric E. Evers ("Evers TR") at 33; Risenhoover Dep. at 60.

On Thursday, February 25, Chojnacki obtained under seal from United States Magistrate Judge Dennis Green an arrest warrant for Koresh and a search warrant for the Mount Carmel premises, alleging violations of federal firearms laws. Defendants' Exhibit 2. This information was not communicated to the newspaper. Also on Thursday, Dan Mulloney ("Mulloney"), a cameraman for Defendant KWTX Broadcasting Company ("KWTX"), received a tip from an unnamed source that the ATF would be conducting a raid at the Compound on March 1. Mulloney Dep. at 66. Mulloney informed Richard Bradfield ("Bradfield"), the News Director at KWTX, of the impending raid. Deposition of Richard Bradfield ("Bradfield Dep.") at 10.

Sometime on February 26, Phil Lewis of the ATF contacted Glover and told him that AMT would be needed for one hour on Monday, March 1. Glover Dep. at 22. Glover was not informed of the details of the law enforcement operation or its target. Glover Dep. at 35. At 3:30 p.m. on the 26th Rochner telephoned Chojnacki and informed him that publication of the Koresh series would begin the next day—Saturday, February 27.[11] Curtis Int. at 8; Preddy Dep. at 136; Rochner Dep. at 77. The decision to run the story on Saturday was based upon security reasons—fewer employees would be in the newspaper building over the week-end when retaliation would be most likely to occur. After learning of the newspaper's decision to run its story on Saturday, ATF changed the date of the raid to Sunday, February 28. The ATF agents involved learned of the change that day. Buford TR at 93, 95, 100; Maxwell TR at 28; Risenhoover Dep. at 63–64.

Also on the 26th, Mulloney contacted Dellayne Helmstetter ("Helmstetter"), with whom he had a personal relationship. Mulloney Dep. at 73. Helmstetter also happened to be a dispatcher with AMT. Mulloney told her about the tip he received regarding the raid on the Compound and inquired whether AMT had been contacted to be on stand-by. Helmstetter did not know anything at that time, but agreed to relay any information to him. Mulloney Dep. at 73–76; Deposition of Dellayne Helmstetter ("Helmstetter Dep.") at 21–22, 122, 140.

On Saturday, February 27, the first article in the "Sinful Messiah" series appeared in the newspaper. Witherspoon received a tip that morning from an unnamed source that the raid had been moved from Monday, March 1 to Sunday, February 28. Blansett Dep. at 80. Undercover agent Rodriguez went to the Compound that day to ascertain whether the article had agitated Koresh or caused any increase in security among the Davidians. Rodriguez spent most of the day in the Compound. Koresh was upset about the article and told the other Davidians that the authorities would be coming. Rodriguez

---

**10.** Fort Hood is an army installation located approximately 45 miles south of Waco.

**11.** Although the decision to run the story on Saturday was finally announced on Friday, the decision was made after the meeting with Chojnacki on Wednesday. Rochner Dep. at 80.

TR at 26–27, 30. When Rodriguez reported to Sarabyn, he was instructed to return to the Compound on Sunday morning to make sure everything was still normal and to leave by 9:10 a.m. Rodriguez TR at 26–27, 43, 97, 101, 111.

Also on Saturday, Glover was contacted by the ATF and told that AMT should be available on Sunday rather than Monday. Glover Dep. at 33. Glover was told that a pre-raid briefing would be held at 8:00 a.m. at the Bellmead Civic Center.[12] Glover still was not informed of the purpose of the law enforcement operation or its target. Glover Dep. at 35. Glover had told the AMT dispatchers that the reserve unit would be doing a transfer on Sunday morning. After conferring with the area manager, Tim Brumm, he later told them he would be using the ambulance in a special stand-by assignment. Glover Dep. at 35–36. Helmstetter immediately contacted Mulloney with the information. Helmstetter Dep. at 157, 163.

In a racquetball game that afternoon, Mulloney and Witherspoon confirmed with each other that the raid had been moved from March 1 to February 28. Mulloney Dep. at 84; Deposition of Tommy Witherspoon ("Witherspoon Dep.") at 27–29, 33. Both Mulloney and Witherspoon informed their superiors of the change in the date of the raid. Both the newspaper and KWTX then made plans for various personnel to be at the Compound on Sunday morning. Blansett told a number of newspaper employees to meet at the Trib offices on Sunday morning to coordinate covering the raid at Mount Carmel, including: England, McCormick, Witherspoon, Rod Aydelotte, Bobby Sanchez, Steven Reece, Marc Masferrer and Douglas Doe. Blansett Dep. at 84, 88. Bradfield at KWTX assigned Mulloney, reporter John McLemore, and cameraman Jim Peeler to cover the raid. Bradfield Dep. at 13, 19–20, 21. Neither organization provided its employees with any instructions regarding their own safety or maintaining the secrecy of the ATF operation. Aydelotte Dep. at 70, 88; Bradfield Dep. at 20; Deposition of Douglas

Doe ("Doe Dep."), at 16, 56; Deposition of John McLemore ("McLemore Dep.") at 12.

On Saturday, Rochner and Blansett rode out to the Compound with Bob Lott. Rochner Dep. at 88–89; Blansett Dep. at 93–94. They noticed military helicopters flying toward Texas State Technical College ("TSTC") and followed them. *Id.* At TSTC, they saw several men emerge from the helicopter who Rochner felt were ATF due to his past experience with law enforcement. Rochner Dep. at 89.

Saturday evening, Blansett received a telephone call from Steve Schneider, one of Koresh's senior deputies. Schneider said that Koresh was upset about the Sinful Messiah article that had been published that day and wanted an opportunity to tell the "real story." Blansett Dep. at 70–71. Blansett called England and Rochner to inform them of Schneider's call. *Id.* Rochner, in turn, contacted Chojnacki regarding the call. Rochner Dep. at 92. Chojnacki recommended against sending reporters to the Compound that evening, but did not attempt to dissuade Rochner from sending a reporter out the next morning. *Id.* Rochner then informed Blansett that he did not believe there would be an ATF raid the next day. Blansett, however, still went forward with plans to have reporters on the scene the next morning.

At approximately 5:00 a.m. on Sunday, February 28, a convoy of vehicles driven by ATF agents left Ford Hood for the Bellmead Civic Center (the "staging area"), arriving between 7:30 and 8:00 a.m. Ballesteros TR at 84; Curtis TR at 6–7; Risenhoover Dep. at 69–70. Sometime that morning, Helmstetter contacted Mulloney and informed him that a CareFlite helicopter had also been alerted to be on stand-by. Mulloney Dep. at 142. At 7:30 a.m., Mulloney, McLemore and Peeler left KWTX to drive to the Compound. Bradfield gave them maps, indicating where they were supposed to go. Bradfield Dep. at 20. Mulloney and Peeler were provided a white Blazer and a white Bronco. The vehicles had no insignia or markings identifying

---

12. Bellmead is a small town north and immediately adjacent to Waco. It is the town closest to the Compound with such facilities.

them as KWTX vehicles, but each was equipped with four or five separate antennas in addition to the antenna for the AM/FM radio. Bradfield Dep. at 23; Peeler Dep. at 17; Evers TR at 115. Additionally, Peeler wore a jacket bearing the KWTX logo. Mulloney and McLemore were in one vehicle, while Peeler drove the other. Bradfield Dep. at 19–23, 27–28. Mulloney and McLemore arrived at the Compound between 7:30 and 8:00 a.m., and parked approximately 1.9 miles from the intersection of FM 2491 and Double EE Ranch Road. Mulloney Dep. at 94–96; McLemore Dep. at 24.

The newspaper reporters met at the Waco Trib offices at 8:00 on Sunday morning. England Dep. at 41; Blansett Dep. at 84. Blansett assigned Steve Reece to remain at the Trib offices and sent Bobby Sanchez to TSTC because of the military helicopters Blansett had seen there on Saturday. Blansett Dep. at 96. The remainder of the employees were to go to the Compound in three newspaper vehicles: Blansett and McCormick in one; Witherspoon, Aydelotte and Mansferrer in a second; and England and Doe in a third. Their caravan arrived at the Compound between 8:30 and 8:45 a.m. Aydelotte and England both parked on FM 2491 close to the intersection with Double EE Ranch Road. Blansett and McCormick drove down Double EE Ranch Road past the Compound, then turned around and came back and parked on FM 2491. Blansett Dep. at 96–97. Blansett then directed England and Doe to go to TSTC and join up with Bobby Sanchez. Blansett Dep. at 98. At TSTC, they saw two helicopters on the runway and a number of law enforcement personnel. Doe Dep. at 24. After waiting some time on FM 2491, Blansett again drove past the Compound on Double EE Ranch Road and parked on that road several hundred yards north of the Compound. Blansett

Dep. at 105. He could see the entrance to the Compound from where he was parked. *Id.* at 108–109.

Peeler was assigned by KWTX to cover the intersection of Double EE Ranch Road and Old Mexia Road. Peeler Dep. at 12. He was not within sight of Mulloney and McLemore, and has no idea what time he arrived. *Id.* Peeler received instructions from Mulloney that there would be a roadblock where he would be able to see Koresh being led out by law enforcement. Peeler Dep. at 10. When he found no roadblock, Peeler was unsure whether he was in the right place. He parked at the intersection of Double EE Ranch Road and Old Mexia Road in order to look at his map. Peeler Dep. at 14. He then continued on Old Mexia Road until he reached Highway 84, never encountering a roadblock. Peeler then turned around and came back to the Double EE Ranch Road intersection and once again consulted his map. Peeler Dep. at 15. While he was stopped, a car pulled alongside and the driver, a mailman, asked if Peeler were lost. Peeler Dep. at 17. Peeler informed the man that he was looking for a roadblock and a place called Rodenville. Peeler Dep. at 17–19. Peeler left his vehicle to talk with the man, his jacket bearing the KWTX insignia clearly visible. Peeler Dep. at 22–24, 27. Peeler additionally identified himself as a cameraman with KWTX. When asked if something were going to happen, Peeler responded that "it might." [13] Peeler Dep. at 21–24. The mailman turned out to be David Jones, son of Perry Jones and brother of Koresh's legal wife. Jones left Peeler and drove directly to the Compound.

While the media were gathering, undercover Agent Rodriguez returned to the Compound pursuant to Sarabyn's instructions. He carried with him a copy of the Sunday edition of the Trib, which contained the sec-

---

**13.** The Affidavits of Dick DeGuerin and Jack Zimmerman, who interviewed several Branch Davidians prior to the conflagration on April 19, 1993, indicate that Peeler was much more communicative than his deposition indicates. DeGuerin was told by David Jones that Peeler had told him there was going to be a raid on the Compound by agents from the National Guard and the Texas Alcoholic Beverage Commission. He additionally told Jones that the agents were loading up at an air strip and that helicopters would be involved. In a post-raid interview with Texas Ranger Coy Smith, Peeler worried that he may have told the mailman too much after learning from local residents that the mailman was a Davidian. Affidavit of Coy Smith ("Smith Aff.") at 2. Peeler additionally expressed concern to Mulloney that he had revealed too much to the mailman. *Id.* at 2–3.

ond installment of the Sinful Messiah series. Conditions inside the Compound were no different than when he had left the evening before. When he showed Compound members the article, they laughed. Rodriguez TR at 42–44, 69–70, 96–97. Rodriguez had been talking with Koresh for approximately 45 minutes when Perry Jones informed Koresh that he had a telephone call. Rodriguez TR at 33. Koresh ignored him, until Jones told him that England was on the phone. The telephone call was apparently a ruse to get Koresh out of the room in order to inform him of David Jones' conversation with Peeler. When Koresh returned, he was nervous and shaking. Rodriguez TR at 34. He told Rodriguez that the ATF and National Guard were coming and said, "They got me once, they'll never get me again." Rodriguez TR at 34. Koresh then walked over to the window and looked straight at the undercover house. He turned to Rodriguez and said, "They're coming, Robert. The time has come." Rodriguez TR at 34, 45–48.

Rodriguez left the Compound shortly after 9:00 a.m. and returned to the undercover house. Agent Cavanaugh was in charge of that location on the morning of the raid, and Rodriguez told him that Koresh was agitated and knew that the ATF and National Guard were coming. Rodriguez TR at 52, 103–04, 192. Rodriguez then called Sarabyn at TSTC where the ATF had set up a command post. He told Sarabyn that Koresh was upset and knew the ATF and National Guard were coming. Rodriguez TR at 103–106; Chojnacki Aff. Sarabyn questioned Rodriguez about what occurred in the Compound prior to his departure. There was no indication that the Davidians were, at that time, preparing to repel an assault. Rodriguez had seen no changing of clothes or gathering of weapons. Chojnacki Aff. The agents in the undercover house were in direct communication with Chojnacki, but also failed to report any signs of unusual activity. Chojnacki Aff. Although they noticed unusually heavy traffic on Double EE Ranch Road, and recognized some of the vehicles as news vehicles, they did not note any unusual movements by the inhabitants of the Compound, such as the holding or gathering of weapons. Affidavit of Herman Porter ("Porter Aff.").

Additionally, one of the undercover agents witnessed the meeting between Jones and Peeler, but heard none of the conversation. Risenhoover Dep. at 18, 117. The undercover agents knew that David Jones was a Davidian. Rodriguez TR at 84, 88. There is no indication, however, that information regarding the presence of the media or the meeting between Jones and Peeler was reported to any of the agents in command.

Chojnacki, Sarabyn and Royster conferred on the airport tarmac and found no reason not to go ahead with the raid. Chojnacki Aff. Chojnacki then gave the go ahead. *Id.* Sarabyn and others began to hurry the agents, informing them that Koresh knew they were coming. Risenhoover Dep. at 97–98; Trial Testimony of Ward Clayton Alexander III at 44–45; Ballesteros TR at 67, 90–91; Trial Testimony of Robert R. Champion at 55; Trial Testimony of Danny Curtis at 7, 84; Trial Testimony of Eric Evers at 104–105, 110; Trial Testimony of Charles Diarrusso at 61. The agents boarded two cattle trailers and left for the Compound.

Meanwhile, after meeting with Sanchez at TSTC, England and Doe returned to the Compound. On the way back on FM 2491, they passed a State Highway Patrol car which later parked on the side of the road. Doe Dep. at 27; England Dep. at 59. England stopped and approached the Trooper and asked if the road ahead was blocked off. England Dep. at 59. The Trooper responded that he had not been assigned to prevent anyone from passing him. *Id.* England and Doe then passed the Trooper and parked behind Mulloney's KWTX vehicle on FM 2491. England Dep. at 60. Mulloney was outside of the vehicle filming at a location from which the Compound was visible. *Id.* After returning to his vehicle, Mulloney drove the KWTX vehicle onto Double EE Ranch Road, drove past the Compound and returned. Mulloney Dep. at 105–106, 138. England followed the KWTX vehicle onto Double EE Ranch Road and parked about 50 yards up from the intersection with FM 2491. England Dep. at 61–63. Aydelotte also followed the KWTX vehicle onto Double EE Ranch Road, and pulled into a drive-way at one of the houses across from the Compound.

Aydelotte Dep. at 35–36. Witherspoon got out of the vehicle to obtain permission to park in the drive-way to view the raid. Witherspoon was told in no uncertain terms to leave the premises. Aydelotte Dep. at 36–37.

The various media individuals then noticed two cattle trailers turning onto Double EE Ranch Road off of FM 2491. The KWTX vehicle followed the trailers onto the Compound property, while the newspaper vehicles stayed back. At approximately the same time the cattle trailers arrived at the Compound, the supporting Texas National Guard helicopters arrived. The ill-fated raid had begun.

The cattle trailers stopped in front of the Compound's main building. Koresh appeared at the front door and yelled, "What's going on?" The ATF agents identified themselves, stated they had a warrant, and yelled "Police" and "Lay down." Koresh slammed the door before the ATF agents could reach it. Gunfire from inside the Compound burst through the door and erupted from windows in the front of the Compound. The ATF agents returned fire. Ballesteros TR at 12–13, 17–23, 44–46; Risenhoover Dep. at 95, 104; Curtis TR at 17, 20. When the shooting began, the various media individuals took cover in ditches beside the road. They remained pinned down until a cease fire had been arranged. Aydelotte Dep. at 32–33, 35–38, 41; Doe Dep. at 27–28; England Dep. at 59–60, 63–64, 67–68; McLemore Dep. at 28–29, 43–44, 86.

After the shooting ceased, four ATF agents lay dead, while numerous others sustained gunshot and shrapnel-related injuries. Defendants' Exhibit 3, Affidavit of Earl Dunagan at 2. Numerous Branch Davidians were also killed during the shoot-out, including Perry Jones. Others, including Koresh, were wounded. A siege then began under the command of the Federal Bureau of Investigation ("FBI"), with only a few of the Davidians emerging from the Compound over the next couple of weeks. The FBI's decision to mount a forceful assault on the Compound on April 19 ended in tragedy, when the building and all but a handful of its inhabitants were consumed in a conflagration set by the Davidians.

## II. DISCUSSION

■ *A. First Amendment.* KWTX and the newspaper argue that any claims against them are barred by the First Amendment to the United States Constitution. The Defendants define Plaintiffs' claims as "negligent reporting" and "negligent publication." Plaintiffs concede that the publication of the Sinful Messiah series does not form the basis for an independent cause of action. See Plaintiffs' Joint Response to Defendants' Motions for Summary Judgment, p. 26 n. 6. Therefore, the Court's opinion will deal solely with the issue of whether the First Amendment protects the media Defendants from liability for any claim for negligence associated with their newsgathering activities on the day of the raid.

■ The First Amendment guarantees of freedom of speech and freedom of the press are deeply rooted in our nation's history. Freedom of the press involves not only the ability to publish the news, but the ability to gather it. "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes,* 408 U.S. 665, 681, 92 S.Ct. 2646, 2656, 33 L.Ed.2d 626 (1972). However, the First Amendment does not invest members of the press with absolute immunity from the consequences of their acts. The First Amendment guarantees the press no greater constitutional right of special access to information than that possessed by the general public. *Id.* at 684, 92 S.Ct. at 2658. *See also Saxbe v. Washington Post,* 417 U.S. 843, 850, 94 S.Ct. 2811, 2815, 41 L.Ed.2d 514 (1974); *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974); *Houchins v. KQED, Inc.,* 438 U.S. 1, 16, 98 S.Ct. 2588, 2597–2598, 57 L.Ed.2d 553 (1978); *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 573, 100 S.Ct. 2814, 2825–2826, 65 L.Ed.2d 973 (1980).

Newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded, and they may be prohibited from attending or publishing information about trials if such

restrictions are necessary to assure a defendant a fair trial before an impartial tribunal.

*Branzburg v. Hayes,* 408 U.S. at 684–685, 92 S.Ct. at 2658.

■ Further, the press must abide by laws of general applicability even though such laws may impose an incidental burden upon the ability to gather or report the news. *Id.* at 682, 92 S.Ct. at 2657; *Cohen v. Cowles Media Co.,* 501 U.S. 663, 669, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991). *See also Associated Press v. NLRB,* 301 U.S. 103, 132–133, 57 S.Ct. 650, 655–656, 81 L.Ed. 953 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws. *He has no special privilege to invade the rights and liberties of others*") (emphasis added).

The press may not with impunity break and enter an office or dwelling to gather news. Neither does the First Amendment relieve a newspaper reporter of the obligation shared by all citizens to respond to a grand jury subpoena and answer questions relevant to a criminal investigation, even though the reporter might be required to reveal a confidential source. *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). The press, like others interested in publishing, may not publish copyrighted material without obeying the copyright laws. See *Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 576–579, 97 S.Ct. 2849, 2857–2859, 53 L.Ed.2d 965 (1977). Similarly, the media must obey the National Labor Relations Act, *Associated Press v. NLRB,* 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953 (1937), and the Fair Labor Standards Act, *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 192–193, 66 S.Ct. 494, 497, 90 L.Ed. 614 (1946); may not restrain trade in violation of the antitrust laws, *Associated Press v. United States,* 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945); *Citizen Publishing Co. v. United States,* 394 U.S. 131, 139, 89 S.Ct. 927, 931, 22 L.Ed.2d 148 (1969); and must pay non-

discriminatory taxes, *Murdock v. Pennsylvania,* 319 U.S. 105, 112, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 581–583, 103 S.Ct. 1365, 1369–1371, 75 L.Ed.2d 295 (1983). Cf. *University of Pennsylvania v. EEOC,* 493 U.S. 182, 201–202, 110 S.Ct. 577, 588–589, 107 L.Ed.2d 571 (1990).

*Cohen v. Cowles Media Co.,* 501 U.S. at 669–670, 111 S.Ct. at 2518. A journalist may even be "punished for contempt of court in appropriate circumstances." *Branzburg v. Hayes,* 408 U.S. at 684, 92 S.Ct. at 2658. Even when dealing with publication, "[t]he prevailing view is that the press is not free to publish with impunity everything and anything it desires to publish," and may be held liable for the publishing of knowing or reckless falsehoods. *Id.* at 683, 92 S.Ct. at 2658.

As in the *Cohen* case, the law at issue here, the Texas law of negligence, is a law of general applicability. "It does not target or single out the press. Rather, ... the doctrine is generally applicable to the daily transactions of all the citizens of [Texas]." [14] *Cohen v. Cowles Media Co.,* 501 U.S. at 670, 111 S.Ct. at 2518–2519. Any burden placed upon the press by its application "is no more than the incidental, and constitutionally insignificant, consequence of applying to the press a generally applicable law" that requires those who injure others through negligence to make them whole. *Id.* at 672, 111 S.Ct. at 2519.

Defendants are no more free to cause harm to others while gathering the news than any other individual. As Plaintiffs note, it would be ludicrous to assume that the First Amendment would protect a reporter who negligently ran over a pedestrian while speeding merely because the reporter was on the way to cover a news story.

Defendant KWTX attempts to distinguish the conversation between Peeler and David Jones as an exercise of free speech, but the Court finds this a distinction without a differ-

---

**14.** As previously noted, the Plaintiffs have asserted various other state law claims against the Defendants. Even though the issue is not specifically before the Court in the present summary judgment motions, the Court is persuaded these other causes of action are also based upon laws of general applicability that do not single out the press.

ence. Practically every tort claim involves some form of communication. A plaintiff is not divested of a cause of action by the First Amendment merely because a tortfeasor speaks. Accordingly, the Court is persuaded that the First Amendment does not protect the media Defendants from liability in this case.

■ *B. Negligence.* While the media Defendants have no First Amendment protection from the application of Texas negligence laws, the next issue is whether Texas recognizes a negligence cause of action under the facts of this case. Neither party has identified any case from any jurisdiction that has held a journalist liable for negligence for actions taken during a law enforcement operation. Nor has the Court been able to identify such a case. There are cases from a number of jurisdictions in which suits were filed by police officers who were injured during the line of duty. The majority of these cases deal with injuries resulting from some type of premises defect. A few, however, do involve situations in which police officers have been injured by the negligence of other parties. These cases are instructive in that the media Defendants, because they are not protected by the First Amendment, face the potential liability faced by any other individual in the same circumstances.

Cases from other jurisdictions have often prevented police officers from recovering damages for injuries arising out of their employment due to application of the so-called "fireman's rule." *Carson v. Headrick,* 900 S.W.2d 685 (Tenn.1995).

> The rule originated over one hundred years ago in *Gibson v. Leonard,* 143 Ill. 182, 32 N.E. 182 (1892). In determining the nature and extent of the duty owed a fireman injured when responding to a fire, the *Gibson* court applied the traditional, premises liability, commonlaw classification rule. Under that rule, the nature and extent of the duty owed an injured person was determined by classifying the injured person as either an "invitee," a "licensee," or a "trespasser." By contrast, a landowner owed only the duty to refrain from willfully injuring a social guest, classified as a "licensee," or a person coming onto the property without permission, classified as a "trespasser." *See Hudson v. Gaitan,* 675 S.W.2d 699, 703 (Tenn.1984) (discussing the common law rule).
>
> Reasoning that a fireman is privileged to enter property at any place and time, without the owner's permission, the *Gibson* court classified the injured fireman as a licensee, and therefore held that the landowner owed only the duty to avoid inflicting injury by willful, wanton, or intentional acts. *Id., see also Pottebaum v. Hinds,* 347 N.W.2d 642, 644 (Iowa 1984) (discussing the historical origin of the rule).
>
> The rule gained wide acceptance, and was universally extended and applied to police officers suing to recover for injuries sustained while encountering risks peculiar to their employment.

*Id.* at 687–688. With the rise of comparative negligence, a *per se* premises liability rule has generally been abandoned, but has persisted through public policy considerations.[15] *Id.* at 689. Many jurisdictions have expanded the rule beyond its premises liability origins to preclude suit for any injury that a police officer might incur as a result of his employment. "Public policy considerations, as well as societal expectations, militate against allowing police officers to institute tort actions against a citizen for an injury resulting from a risk the officer is trained and hired to confront." *Id.*

Other jurisdictions have abolished the fireman's rule either through statute or court

---

**15.** Some jurisdictions which still recognize some aspect of the fireman's rule include: Florida [*Sanderson v. Freedom Savings & Loan Assn.,* 496 So.2d 954 (Fl.Dist.Ct.App.1986), aff'd. 548 So.2d 221 (Fla.1989)]; Kentucky [*Fletcher v. Illinois Central Gulf Railroad Co.,* 679 S.W.2d 240 (Ky. Ct.App.1984), review denied]; Maryland [*Flood v. Attsgood Realty Co.,* 92 Md.App. 520, 608 A.2d 1297 (Md.Ct.Spec.App.1992)]; Michigan [*Reetz v. Tipit, Inc.,* 151 Mich.App. 150, 390 N.W.2d 653 (Mich.Ct.App.1986), *aff'd. sub nom Kreski v. Modern Wholesale Elec. Supply Co.,* 429 Mich. 347, 415 N.W.2d 178 (Mich.1987)]; New Jersey [*Entwistle v. Draves,* 194 N.J.Super. 571, 477 A.2d 435 (N.J.Super.Ct.App.Div.1984), aff'd., 102 N.J. 559, 510 A.2d 1 (N.J.1986)]; Ohio [*Scheurer v. Trustees of the Open Bible Church,* 175 Ohio St. 163, 192 N.E.2d 38 (Ohio 1963)]; and Tennessee [*Carson v. Headrick,* 900 S.W.2d 685 (Tenn. 1995)].

decision in favor of a general duty of reasonable care.[16] *Id.* Texas courts have neither adopted nor rejected the fireman's rule. A recent case out of the El Paso Court of Appeals recognizes the rule, but appears to limit its application to the owners of property in a premises liability context. *See Airington v. Juhl,* 883 S.W.2d 286 (Tex.App.—El Paso 1994, writ granted). In the *Airington* case, a police officer injured his back when he attempted to remove a demonstrator from a protest at an abortion clinic. The officer sued the person he attempted to lift as well as some of the other members of the protest group. The court noted, "In the instant case, the abortion protesters were not owners or occupiers of land; therefore, we conclude that the 'Fireman's Rule' of premises liability is inapplicable to Appellees." *Id.* at 291.

Cases from other jurisdictions reflect that the rule is equally inapplicable to cases in which a police officer is injured by "an independent actor not connected with the event bringing the officer to the place of injury," or by "conduct which the officer could not reasonably anticipate would occur by reason of his presence at the place of injury." *Lenthall v. Maxwell,* 138 Cal.App.3d 716, 719, 188 Cal.Rptr. 260 (Ca.Ct.App.1982). Accordingly, the "fireman's rule" is inapplicable to the present case as the Defendants are not the owners of the premises where the Plaintiffs were injured, they were not connected with the event bringing the officers to the place of injury, and their conduct was not something the Plaintiffs could reasonably anticipate.

As noted, a great many of the cases brought by police officers deal with issues of premises liability. However, a number of cases have allowed police officers to sue as a result of injuries sustained through the negligence of others. *See Daas v. Pearson,* 66 Misc.2d 95, 319 N.Y.S.2d 537 (N.Y.Sup.Ct.), *aff'd.* 37 A.D.2d 921, 325 N.Y.S.2d 1011 (N.Y.App.Div.1971) (police officer injured in automobile wreck while responding to false emergency call was allowed to maintain negligence action against individual who made false call); *Airington v. Juhl,* 883 S.W.2d 286 (Tex.App.—El Paso 1994, writ granted) (police officer injured while attempting to remove abortion protester); *Ducote v. Voorhies,* 350 So.2d 1289 (La.Ct.App.1977) (police officer allowed to maintain action against individual who shot him and the individual's mother who officer alleged failed to warn of son's condition, although appellate court determined there was insufficient evidence to hold mother liable); *Lave v. Neumann,* 211 Neb. 97, 317 N.W.2d 779 (Neb.1982) (police officer allowed to recover for injuries sustained when attempting to stop semi-truck that had been negligently parked by driver); and *Christensen v. Murphy,* 296 Or. 610, 678 P.2d 1210 (Or.1984) (the estate of police officer who was killed as a result of a youth's escape from a youth center was allowed to maintain action against county and county employee who negligently allowed youth to escape). None of these cases, however, specifically deal with the situation presented in the instant suit. The Court must, therefore, determine whether a negligent cause of action may be maintainable under Texas law given the facts of this case.

The common-law doctrine of negligence consists of three essential elements: "a legal duty owed by one person to another, a breach of that duty, and damages proximately resulting from the breach." *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex. 1987). The threshold inquiry is whether a duty exists, which is a question of law for the Court. *Eimann v. Soldier of Fortune Magazine, Inc.,* 880 F.2d 830, 834 (5th Cir.1989), *cert. denied,* 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 748 (1990). The basic "duty" in a negligence case is "to exercise reasonable care to avoid foreseeable injury to others." *El Chico Corp. v. Poole,* 732 S.W.2d at 311. This involves consideration of two related issues: "(1) whether the defendant owes an obligation to this particular plaintiff to act as a reasonable person would in the circum-

---

**16.** Some courts that have questioned or abolished the fireman's rule include: California [*Bartholomew v. Klingler Co.,* 53 Cal.App.3d 975, 126 Cal.Rptr. 191 (Cal.Ct.App.1976)]; Nebraska [*Lave v. Neumann,* 211 Neb. 97, 317 N.W.2d 779 (Neb.1982)]; New York [*Warner v. Adelphi University,* 166 Misc.2d 851, 634 N.Y.S.2d 989 (N.Y.Sup.Ct.1995); and *Iaccarino v. Welland Estates, Ltd.,* 178 A.D.2d 402, 577 N.Y.S.2d 105 (N.Y.App.Div.1991)]; and Oregon [*Christensen v. Murphy,* 296 Or. 610, 678 P.2d 1210 (Or.1984)].

stances; and (2) the standard of conduct required to satisfy that obligation." *Eimann v. Soldier of Fortune Magazine, Inc.,* 880 F.2d at 834. A duty may arise from statute or common law. *El Chico Corp. v. Poole,* 732 S.W.2d at 312. A number of criminal statutes under both federal and state law establish that society has a duty not to interfere with a law enforcement officer during the course of his responsibilities.[17] There is no exclusion in these statutes for members of the press. Therefore, the Court is persuaded these statutes create a duty upon all individuals, including the media, not to negligently interfere with the execution of arrest or search warrants.

Even if no statutory duty existed, the equities in this case would require a common-law duty. In determining whether such a duty exists, Texas courts apply a risk-utility balancing test. *Eimann v. Soldier of Fortune Magazine, Inc.,* 880 F.2d at 834; *Rodriguez v. Spencer,* 902 S.W.2d 37, 41 (Tex.App.— Houston [1st Dist.] 1995, no writ). *See also SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347 (Tex.1995).

> The court must consider several factors, including risk, foreseeability, and likelihood of injury weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the injury and consequences of placing that burden on the defendant.

*Rodriguez v. Spencer,* 902 S.W.2d at 41 (citations omitted). The "foremost and dominant consideration" is the foreseeability of the risk. *El Chico Corp. v. Poole,* 732 S.W.2d at 311.

"The test for foreseeability is what one should, under the circumstances, reasonably anticipate as the consequences of one's conduct." *Rodriguez v. Spencer,* 902 S.W.2d at 41. The summary judgment proof reflects that the media defendants were aware of the potential for violence possessed by David Koresh and the Branch Davidians. As previously noted, Koresh and his followers had participated in an armed attack on the Mount Carmel community in an attempt to oust George Roden. This event and the resulting trial were heavily covered by the local media. Additionally, the newspaper's recent investigation into the Davidians had uncovered information that the sect was heavily armed and that its members were suspected of engaging in criminal activity. Blansett Dep. at 180, 188, 190–191; Bradfield Dep. at 10, 15, 55–56; England Dep. at 50; Elmore Dep. at 11–12; Preddy Dep. at 102; Witherspoon Dep. at 60. The newspaper requested additional security advice from its parent company due to the fear of retaliation and enacted various security measures to protect its employees. KWTX was additionally aware of the potential for violence, as exhibited by the fact that Mulloney made out a will the Saturday evening before the raid, which he had never done before. Mulloney Dep. at 87–79.

The media Defendants equally appreciated the risk of compromising the secrecy of the raid, and the likelihood that agents would be injured if that secrecy were compromised. They were aware that a raid was going to be conducted, and that the timing of the raid would not be disclosed. ATF had consistently refused to confirm a time or date for the raid to the newspaper. Nor did ATF promise to inform any of the media to allow them to observe the raid. Knowing of the violent nature of the Davidians, and the ATF's desire for secrecy, it was entirely foreseeable that a breach of that secrecy would increase the danger attendant upon serving the warrants upon the Davidians. The members of the media recognized that the officers could be harmed if secrecy were not maintained. Preddy Dep. at 117–18; Elmore Dep. at 77; Blansett Dep. at 187; Witherspoon Dep. at 66–67; Aydelotte Dep. at 78; Bradfield Dep. at 74; McLemore Dep. at 54–56; Mulloney Dep. at 138–39, 165.

Balanced against the preceding is the "social utility of the defendant's conduct, the

---

**17.** The statutes at issue prohibit the following: 18 U.S.C. § 111 (impeding a law enforcement officer while engaged in the performance of his official duties); 18 U.S.C. § 2231 (impeding or interfering with the execution of a search warrant); 18 U.S.C. § 2232 (giving notice of a search or seizure or electronic surveillance or physically interfering with a search or seizure); and Texas Penal Code § 38.05 (hindering an arrest by warning the suspect of impending apprehension).

magnitude of the burden of guarding against the injury and consequences of placing that burden on the defendant." *Rodriguez v. Spencer*, 902 S.W.2d at 41. As previously noted, freedom of the press is one of the most important of our constitutional rights, and gathering of the news is one of its necessary components. Freedom to publish would be meaningless without the corresponding ability to investigate. *See Branzburg v. Hayes*, 408 U.S. at 681, 92 S.Ct. at 2656–2657. However, the social utility of newsgathering in general is not at issue. The issue is whether the actions of the Defendants in failing to exercise some degree of caution to avoid warning the Davidians of the impending raid outweighs the risk that compromising the secrecy of the operation would result in death and injury to a number of law enforcement agents. KWTX argues that the Court should refrain from creating a rule that would hold the media liable for "routine" newsgathering activities. The summary judgment proof establishes that there was nothing routine about the events at Mount Carmel and hopefully such events will never be repeated. Clearly, demanding that the press act responsibly in such a unique situation will not "chill" first amendment rights, no more so than demanding that any individual citizen act responsibly. Nor will it interfere with normal, run-of-the-mill press investigations.

In this case, the balancing of factors clearly establishes that the media defendants owed a duty to the Plaintiffs not to warn the Davidians, either intentionally or negligently, of the impending raid.

■ *C. Proximate Cause.* All Defendants seek summary judgment based upon the argument that their actions were not the proximate cause of Plaintiffs' injuries. While determining the existence of a duty is an issue of law for the Court, the determination of causation is an issue of fact for the jury. *First Interstate Bank v. S.B.F.I., Inc.*, 830 S.W.2d 239, 246 (Tex.App.—Dallas 1992, no writ). Proximate cause includes two elements: foreseeability and cause in fact. *Urbach v. United States*, 869 F.2d 829, 831 (5th Cir.1989).

■ The newspaper Defendants assert that there is no proof that their actions were a cause in fact of the Plaintiffs' injuries. The basis for the Plaintiffs' claims against the newspaper Defendants is the following conduct: (1) publication of the "Sinful Messiah" articles; (2) presence of a number of newspaper reporters in vehicles near the Compound on the morning of the raid; and (3) a telephone call from Mark England to the inhabitants of the Compound on the morning of the raid. As previously noted, the Plaintiffs have dropped their claim based upon negligent publication. Therefore, the Court is concerned only with the conduct of the reporters and the England telephone call on the morning of the raid.

The summary judgment proof presented is sufficient to present a material issue of fact as to whether or not the Defendants' actions were a proximate cause of the injuries suffered by the Plaintiffs, except as to the claims asserted against Defendant Mark England. The evidence regarding the Davidians' knowledge of the media's presence comes from Peeler, who alerted David Jones to the impending raid, and the affidavits of Dick DeGuerin and Jack Zimmerman, who spoke with many of the Davidians afterwards. DeGuerin and Zimmerman note that David Jones was told by Peeler that there was going to be a raid on the Compound, whereupon Jones returned to the Compound and informed Koresh. DeGuerin Aff.; Zimmerman Aff. However, Peeler testified in his deposition that David Jones stated, "Something's going to happen. There's too much traffic on this road." Part of that traffic was caused by the newspaper.

The Compound is located in a rural area, with few close neighbors. Double EE Ranch Road can barely be classified as two-lane, and has not been identified as a main thoroughfare. Across from the Compound are three or four small houses, whose inhabitants and their vehicles are readily visible from the Compound. The presence of strange vehicles on the road would certainly be noticed, particularly when there are a number of them and when they drive aimlessly up and down the road while the occupants watch the Compound.

As mentioned previously, the newspaper had at least nine individuals covering the raid—seven at the compound, one at TSTC and one at the newspaper offices. The seven reporters at the Compound were jammed into three cars, two of which were white station wagons owned by the newspaper. Prior to the raid, Blansett and McCormick drove by the Compound three separate times (from FM 2491 and back on one occasion, and from FM 2491 to park past the Compound on Double EE Ranch Road on the other). When parked, either on FM 2491 or Double EE Ranch Road, the Blansett vehicle was visible from the Compound. When they first arrived at the Compound, the Aydelotte and England vehicles parked on FM 2491 close to the intersection with Double EE Ranch Road at a location that was visible from the Compound. The Aydelotte vehicle drove down Double EE Ranch Road and pulled into the drive-way of one of the houses across from the Compound. When asked to leave, they also parked on Double EE Ranch Road in clear view of the Compound. Finally, once the England vehicle returned from TSTC, it also was parked on Double EE Ranch Road within clear view of the Compound.

KWTX sent one reporter and two cameramen to cover the raid. The vehicle driven by Mulloney initially was parked close to two miles from the intersection of FM 2491 and Double EE Ranch Road in a spot that was not readily visible to the Compound. However, Mulloney moved his Blazer closer and closer, until he parked close to the intersection in order to get shots of the Compound. Just as the Compound was visible to him, he was visible from the Compound. Subsequently, Mulloney did what the Blansett vehicle did—he drove down Double EE Ranch Road past the Compound, then turned around and came back. The KWTX vehicle was easily identifiable to the agents in the area as a news vehicle due to the number of antennas it possessed, just as it could have been identified by any other reasonable person, including the inhabitants of the Compound.

The other KWTX cameraman, Peeler, actually conversed with one of the Davidians, who expressed alarm at the amount of traffic on the road. The newspaper asserts that Peeler's testimony should be discounted because he has told different versions of what occurred the day of the raid. The Court views this as a credibility issue which cannot be resolved in a motion for summary judgment. There are, therefore, material issues of fact presented as to whether the actions of the media Defendants, individually or collectively, alerted the Davidians to the impending raid.

The Court also notes that the Plaintiffs' position is supported by Joseph E. Goulden ("Goulden"), a media expert.[18] According to Goulden, the media Defendants committed serious professional errors when they established no guidelines for their staff to follow to enable them not to undermine the law enforcement operation. Even without the testimony of this witness, common sense would dictate that a reporter on the scene would do everything possible to avoid detection when covering what is known to be a secret law enforcement operation. Instead, the media arrogantly descended on the Compound as if the First Amendment cloaked them with immunity from acting as reasonable individuals under the circumstances. Their actions are particularly egregious when considered in light of the fact that they knew how dangerous Koresh and his followers were. The newspaper particularly knew of the weapons that were stockpiled, Koresh's hatred of the government, and the blind devotion of his followers. The newspaper further knew of the guards that were generally posted around the Compound and the likelihood that their presence would be detected.

 There is also a fact issue as to whether the actions of AMT were a proximate cause of the injuries suffered by Plaintiffs. AMT knew that the proposed ATF operation was secret, due to the fact that the ATF would not disclose the specific location or proposed target. Despite this, AMT,

---

**18.** Although Defendants seek to discount this testimony, the Court believes that their arguments go to the weight to be given this witness' testimony rather than its admissibility.

through Helmstetter,[19] gave Mulloney sufficient information to enable him to confirm the time and date of the raid. AMT knew that with this information, Mulloney would be at the scene of the raid and that, given their knowledge of Mulloney, that his presence at the scene could breach that security, alert the Davidians, and cause injury to the Plaintiffs.

The Defendants further argue that the ATF's decision to proceed with the raid, despite knowing that the element of surprise had been compromised, was an intervening, superseding cause of Plaintiffs' injuries that cut off any liability on the part of Defendants. An intervening act by a third party may destroy the "causal connection between the defendant and the plaintiff's injury," if the act of the independent agency "was the immediate cause of the plaintiff's injury and was not reasonably foreseeable." *Urbach v. United States*, 869 F.2d at 833. Foreseeability, in this instance, "requires that the actor, as a person of ordinary intelligence, would have anticipated the danger that his negligent act created for others...." *Id.* at 831, quoting *City of Gladewater v. Pike*, 727 S.W.2d 514, 517 (Tex.1987). Foreseeability does not, however, "require that a person anticipate the precise manner in which injury will occur once a negligent situation that he has created exists." *Id.*

The elements relevant in determining whether an intervening force is a superseding cause include:

(1) whether the intervening force brings about harm that is "different in kind from that which would otherwise have resulted from the actor's negligence";

(2) whether the chain of circumstances appears to be extraordinary;

(3) whether the intervening force operates "independently" of the situation created by the actor;

(4) whether the operation of the intervening force is the result of a third person's act;

(5) whether the act of the third person is wrongful; and

(6) the "degree of culpability" of the third person for the wrongful act that "sets the intervening force in motion."

*Urbach v. United States*, 869 F.2d at 833–34, citing Restatement (Second) of Torts, § 442. *See also Humble Oil & Refining Co. v. Whitten*, 427 S.W.2d 313, 315 (Tex.1968).

██ In the present case, the summary judgment proof presented is sufficient to present a material issue of fact as to whether the ATF's decision to continue with the raid was an intervening cause of the Plaintiffs' injuries, or merely a contributing factor under comparative negligence. It was arguably foreseeable to the newspaper and KWTX that the failure to provide any guidelines or instructions to the reporters sent to the scene could result in the Davidians being alerted to the impending raid. Further, it was arguably foreseeable that the ATF would continue with the raid despite knowing that Koresh had been tipped off, based upon the scant information possessed by the ATF at the time. As previously noted, the ATF was apparently unaware that the Davidians had been told positively by Peeler that a raid was imminent, Agent Rodriguez did not see the Davidians preparing for a raid even though he was in the Compound when Koresh received information about the raid, and the agents in the undercover house could detect no unusual signs of increased activity in the Compound. Accordingly, the Court is unable to find as a matter of law that the actions of the Defendants were not a proximate cause of the Plaintiffs' injuries. The cases cited by Defendants do not alter this result, especially since both went to trial rather than being disposed of on summary judgment. *See In re Air Crash at Dallas/Ft. Worth Airport*, 919 F.2d 1079 (5th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct. 276, 116 L.Ed.2d 228 (1991); *Aerospatiale Helicopter v. Universal Health*, 778 S.W.2d 492 (Tex. App.—Dallas 1989, error denied), *cert. denied*, 498 U.S. 854, 111 S.Ct. 149, 112 L.Ed.2d 115 (1990). Therefore, summary

---

**19.** Helmstetter and Mulloney both testified in their depositions that Jimmy Glover was aware that Helmstetter was feeding information to Mulloney. Glover denies this, thereby creating another material issue of fact as to the level of AMT's involvement.

judgment is inappropriate as to Defendants Cox Enterprises, KWTX and AMT.

However, there is no summary judgment proof that Mark England telephoned the Compound on the morning of the raid. Plaintiffs' "proof" rests upon the affidavit of Plaintiff Risenhoover, who is not personally acquainted with the facts surrounding that telephone call. The only surviving witness is Agent Rodriguez, whose testimony at the criminal trial reflects that the "England" reference in Perry Jones' statement was to a location rather than a person.[20] Additionally, at the time the telephone call was allegedly made, England was with Doe near the Compound in a car that was not equipped with any type of communications equipment. Doe Dep. at 39; England Dep. at 41, 46–47. Plaintiffs offer nothing to indicate that England was ever in a position to make the telephone call. Therefore, summary judgment will be granted as to Plaintiffs' claims against Mark England individually.

*D. Remaining Claims.* The newspaper Defendants have also moved for summary judgment as to Plaintiffs' remaining claims: (1) breach of contract; (2) conspiracy; (3) intentional infliction of emotional distress; and (4) interference with a law enforcement officer during the course of his duties. Defendants assert they are entitled to summary judgment on the remainder of Plaintiffs' claims for the following reasons: (1) the Defendants' actions were not a proximate cause of Plaintiffs' injuries; and (2) there is no evidence to support the required elements of these claims.

 Even assuming there is sufficient evidence to establish the proximate cause issue, there is insufficient evidence to establish at least one element of each of these remaining causes of action. There is nothing to indicate that the newspaper ever agreed to delay publication of the "Sinful Messiah" articles. The summary judgment proof presented reflects the contrary—each request by ATF to delay publication was denied. Elmore Dep. at 17; Preddy Dep. at 55–57. Nor is there any evidence to support a claim

of civil conspiracy. The most that can be said from the summary judgment proof presented is that a newspaper reporter and a KWTX photographer confirmed separate tips that each had received regarding the proposed raid. Further, allegations of intentional infliction of emotional distress are not factually supported. While negligence on the part of some defendants may be present, there is nothing to establish the extreme and outrageous conduct required for such a claim. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). Finally, to the extent Plaintiffs' claims are based upon the violation of state or federal criminal statutes, they are equally without merit. There is nothing to reflect the criminal intent necessary for a violation of those statutes.

In light of the foregoing, it is

**ORDERED** that the Motion for Summary Judgment filed by Defendant Mark England is **GRANTED.** It is further

**ORDERED** that the Motion for Summary Judgment filed by Defendants Cox Texas Publications, Inc. and Cox Enterprises, Inc. is partially **GRANTED** as to all claims except negligence in alerting the Davidians to the impending ATF raid. It is further

**ORDERED** that the Motions for Summary Judgment filed by Defendants KWTX Broadcasting Company and Rural Metro Corporation of New Mexico–Texas, d/b/a American Medical Transport are **DENIED.**

---

**20.** Interestingly, Agent Rodriguez, who is also a Plaintiff, has not named Mark England as a Defendant in this case.