**In re FACTOR VIII OR IX CONCENTRATE BLOOD PRODUCTS LITIGATION.**

**Nos. MDL–986, 93 C 7452.**

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 10, 1998.

See also, 174 F.R.D. 412.

---

David S. Shrager, Shrager, McDaid, Loftus, Flum & Spivey, Philadelphia, PA, Dianne M. Nast, Roda & Nast, P.C., Lancaster, PA, for Plaintiffs.

Mark C. Meyer, Cunningham, Meyer & Vedrine, Wheaton, IL, for Defendant NHF.

## MEMORANDUM OPINION

GRADY, District Judge.

Before the court is defendant National Hemophilia Foundation's motion for summary judgment pursuant to F.R.C.P. 56(b), or in the alternative, for summary determination of major issues pursuant to F.R.C.P. 56(d). For the reasons stated below, the motion is denied.

## BACKGROUND

Plaintiffs in this multidistrict litigation are hemophiliacs and the personal representatives of deceased hemophiliacs who used certain blood products known as "factor concentrates" to treat their hemophilia and, as a result, became infected with the HIV virus. The defendant National Hemophilia Foundation ("NHF") is a nonprofit organization that provided information to hemophiliacs about blood products in the 1980s. It has been sued in some but not all of the cases consolidated before this court pursuant to 28 U.S.C. § 1407 for pretrial purposes. NHF membership includes chapters (usually on a statewide basis), medical providers and the leading members of the plasma industry. Part of its stated mission is to promote "programs of research; patient, public and professional education; and patient, family and community services." [1] The NHF also develops medical treatment standards or recommendations which are disseminated and relied upon by physicians in their treatment of persons with hemophilia.

The plaintiffs allege that the NHF established itself as the "preeminent authority" and "principal educator" on medical treatment issues impacting persons with hemophilia. The plaintiffs also assert that, early in the AIDS epidemic, the NHF assumed a leadership role in informing, guiding and educating hemophiliacs, their treaters and the media regarding the proper treatment of hemophilia in light of the AIDS risk.

The primary theory of liability is that the NHF was negligent in providing information and advice to its members and for the benefit

---

1. Opposition to Motion for Summary Judgment, Submitted on behalf of John Roe, Exhibit A

(NHF Mission Statement).

of the hemophilia community at large. The allegations are that the NHF made false, incorrect and misleading statements regarding the safety of factor concentrates manufactured and distributed by the other defendants in this litigation.[2] Plaintiffs charge that the NHF negligently recommended use of the concentrates when it should have known of the danger of viral contamination, failed to warn its members about that danger, failed to recommend timely recall of the concentrates and failed to disclose certain relationships between NHF board members and the defendant manufacturers. In addition to the negligence allegations, it is claimed that the NHF violated certain fiduciary duties owing to the plaintiffs. Plaintiffs claim that, as a result of the NHF's actions, they and their decedents relied on the NHF, used the concentrates and became infected with the HIV virus. In many cases the infections have resulted in death.[3]

In moving for summary judgment, the NHF argues that its First Amendment rights to free speech and free press would be abridged if courts were to impose liability on it because of its communications. It contends that the First Amendment absolutely protects it from tort actions alleging negligent communications. It argues in the alternative that it may be held liable for misstatements only under a malice or "calculated falsehood" standard. It also contends that the First Amendment offers a qualified privilege because NHF publications reported on issues of public concern. Finally, the NHF asserts that it is entitled to First Amendment protection for not speaking, and thus cannot be held liable for failures to warn.

## DISCUSSION

### I. *Freedom of Speech and Press*

■ The First Amendment to the United States Constitution provides that "Congress shall make no law ... abridging the freedom of speech, or of the press."[4] These freedoms are among those protected by the Fourteenth Amendment against abridgement by the states. *Thornhill v. State of Alabama*, 310 U.S. 88, 95, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

■ A threshold issue is whether sufficient governmental action exists to implicate the First Amendment. The NHF claims that the imposition of tort liability would be sufficient. This is correct. The Supreme Court has established that the imposition of tort liability constitutes state action which implicates the First and Fourteenth Amendments. *New York Times Co. v. Sullivan*, 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see also Cohen v. Cowles Media Co.*, 501 U.S. 663, 668, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) ("Our cases teach that the application of state rules of law in state courts in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment."); *cf. Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, 674,

**2.** The four manufacturer defendants are Baxter Healthcare Corporation, Bayer Corporation, Alpha Therapeutic Corporation and Armour Pharmaceutical Company. They are charged with various negligent acts and omissions which caused the concentrates to become contaminated with the HIV virus.

**3.** Plaintiffs' factual allegations are not disputed in relation to the present motion, which addresses only questions of law.

**4.** The NHF argues that its publications are protected by the First Amendment's guarantee of freedom of the press as well as its guarantee of freedom of speech. We agree that the NHF could be considered a member of the press. As one court noted:

> [T]he protections which the First Amendment extends to newsgathering activities are not restricted to those who identify themselves as journalists by education, employment or other such criteria ... [T]he privilege is not limited to the writers of large established newspapers and media enterprises but is equally applicable to the sole publisher of a newsletter or other writing or paper distributed to the public to inform, to comment, or to criticize, albeit such a publication may be unpopular in the eyes of many of its potential readers.

*Liberty Lobby, Inc. v. Rees*, 111 F.R.D. 19, 20 (D.D.C.1986) There is no distinction between the protections afforded freedom of the press and freedom of speech. *See* ROTUNDA & NOWAK 4 RONALD ROTUNDA & JOHN NOWAK, TREATISE ON CONSTITUTIONAL LAW § 20.19 (noting that this may be because there is no principled way of distinguishing them). Therefore, we will treat the NHF as a member of the press and consolidate our discussion of NHF's freedom of speech and press arguments into this one section of our opinion.

116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) ("[c]onstitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights") (quoting *Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154) In this multidistrict litigation, we are concerned only with the action of federal courts, so the Fourteenth Amendment is not involved. But the analysis is the same: imposition of tort liability by federal courts would constitute governmental action for First Amendment purposes. Nothing in the plaintiffs' several briefs suggests that imposing tort liability would not amount to governmental action.

The relevant First Amendment jurisprudence is less clear beyond this point. Deciding whether particular speech is entitled to protection is sometimes difficult because of disagreement about the proper analytical approach. Even in established areas of First Amendment jurisprudence, the "Supreme Court oftentimes develops different tests for the permissible scope of restrictions on the various types of speech." 4 RONALD ROTUNDA & JOHN NOWAK, TREATISE ON CONSTITUTIONAL LAW § 20.1 (1992) (hereafter referred to as "Rotunda & Nowak").

The parties have suggested several ways of looking at the question. The NHF analyzes its speech in the context of the commercial versus non-commercial speech dichotomy. At least one of the plaintiffs argues that such labels are meaningless and that a balancing test should be used instead.

The NHF begins by arguing that its publications are noncommercial speech [5] and because of that status can lose protection in only four circumstances—libel, obscenity, incitement and fighting words. In support of its position that only these four categories of speech are unprotected, the NHF cites *Bigelow v. Virginia,* 421 U.S. 809, 819, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). It reasons that

it is entitled to full First Amendment protection from liability in this litigation unless we find that its speech falls into one of the four unprotected categories.

We disagree with the NHF's view of the law. No Supreme Court case has held that the four categories of speech mentioned in *Bigelow* are an exhaustive enumeration of unprotected speech. The statement in *Bigelow* was made in the context of analyzing the protections afforded to commercial speech generally. *See* 421 U.S. 809, 819, 95 S.Ct. 2222, 44 L.Ed.2d 600. The Court stated that speech is not deprived of protection simply because it is commercial, and went on to add that the particular speech at issue was not within any of the four categories that traditionally fell outside First Amendment protection. But *Bigelow* did not hold that those categories are the only ones that lack First Amendment protection.[6] *Cf. Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C.,* 518 U.S. 727, 741, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Breyer, J., joined by Stevens, O'Connor and Souter, JJ.) (jurisprudence interpreting the First Amendment has done so "without imposing judicial formulae so rigid that they become a straitjacket that disables Government from responding to serious problems"). Moreover, the other case NHF relies on expressly recognized that "[t]he parameters and protections of the First Amendment are impossible to define precisely." *DeFilippo v. National Broadcasting Co., Inc.,* 446 A.2d 1036, 1039 n. 4 (R.I.1982).

The NHF argument is belied by a considerable body of law denying First Amendment protection in situations not involving obscenity, libel, incitement or fighting words. For example: speech that invades privacy, see *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (newsworthy person can recover under a New York statute for speech that invaded privacy if there was malice); speech that breaches a promise of

---

**5.** The plaintiffs do not contend that the publications constitute commercial speech.

**6.** Defendant has called our attention to only one decision that has used this approach, (in a case involving the parties to this litigation), see *Wilson*

*v. Alpha Therapeutic Corp.,* No. 95 L 264 (Ill. Circuit Ct., Vermilion County, Ill., July 30, 1997). We do not find the decision helpful, however, because the court offered no analysis to support its conclusion.

confidentiality, see *Cohen v. Cowles Media Co.*, 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991) (First Amendment does not prohibit person providing information from recovering damages under state's promissory estoppel law for publisher's breach of promise of confidentiality given in exchange for information); speech that infringes a copyright, see Rotunda & Nowak § 20.36 (discussing accommodation between free speech and copyright protection); speech that is harassing, see *In re Stonegate Sec. Serv., Ltd.*, 56 B.R. 1014, 1018 (N.D.Ill. 1986) (Grady, J.) ("It is not unconstitutional to prohibit harassing conduct, even if that conduct involves verbal components," but ultimately finding that conduct and speech at issue deserved protection); speech that infringes a performer's right of publicity, see *Zacchini v. Scripps–Howard Broad. Co.*, 433 U.S. 562, 578, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977) (although a state may privilege its media to broadcast a performer's entire act without his consent, the First Amendment does not require it to do so); and speech that constitutes fraudulent misrepresentation, see *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 637, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (government can prohibit and punish conduct that amounts to fraudulent misrepresentation, but finding that the law in question violated the First Amendment).

■ Some of these cases are significant for another reason: they illustrate the well-established principle that the protections of the First Amendment do not shield the press from laws of general applicability. *See Cohen*, 501 U.S. at 669, 111 S.Ct. 2513 (citing cases and stating that it is "beyond dispute that '[the press] has no special immunity from the application of general laws. [It] has no special privilege to invade the rights and liberties of others.' "). A law of general applicability is one that "does not target or single out the press" but applies to the "daily

transactions of all citizens." *Id.* 501 U.S. at 670, 111 S.Ct. 2513 (concluding that Minnesota's doctrine of promissory estoppel is a law of general applicability).[7]

■ It is, of course, true that when the press is confronted with potential liability for the content of its publications, there is a danger of chilling vigorous public discourse. The Supreme Court has recognized this tension in the context of tort liability for defamation. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("Some tension necessarily exists between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury."); *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 152, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ("[S]ome antithesis between freedom of speech and press and libel actions persists, for libel remains premised on the content of speech and limits the freedom of the publisher to express certain sentiments, at least without guaranteeing legal proof of their substantial accuracy"); *New York Times*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (defamed plaintiff who is a public official may recover only if he can show malice). The *Gertz* court explored this problem when it traced the analytical underpinnings of *New York Times* and *Curtis Publishing Co.*, which had granted the press a qualified privilege from liability in libel suits brought by public officials and public figures:

> We think that these decisions are correct, but we do not find their holdings justified solely by reference to the interest of the press and broadcast media in immunity from liability. Rather, we believe that the *New York Times* rule states an accommodation between this concern and the limited state interest present in the context of libel actions brought by public persons.

*Gertz*, 418 U.S. at 343, 94 S.Ct. 2997. The court went on to balance the competing inter-

---

7. The NHF argues that the term "general applicability" has "never meant that the media were at the mercy of any state court negligence theories while engaged in First Amendment protected speech merely because those negligence theories could be labeled 'laws of general applicability.' " Defendant's Reply Brief, at p. 14. The NHF also argues that the principle of general applicability

operates only when the law in question governs the business functions of the press, not the content of publications. *Id.* at 15 (citing no authority for this but declaring it to be a "common theme" behind application of the principle). Both arguments are unsupported by precedent and are clearly at odds with the plain meaning of *Cohen*.

ests at stake in the case before it, a case where a *private* individual brought a libel action against a magazine. Under those different circumstances, with different competing interests, *Gertz* concluded that "the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Id.* 418 U.S. at 347, 94 S.Ct. 2997 (stating one caveat: that a state may not impose liability without fault). In so holding, *Gertz* recognized that the press may be held liable for defamation under ordinary negligence principles. *See id.* 418 U.S. at 350, 94 S.Ct. 2997 (noting that punitive damages should not be allowed under a negligence standard but only under the heightened *New York Times* standard).[8]

■ Although we do not have a defamation case before us, we believe the *Gertz* analysis is appropriate to this situation. First, libel is not the only form of tortious speech that is unprotected by the First Amendment, *see, e.g., Time*, 385 U.S. at 387, 87 S.Ct. 534 (no First Amendment protection if publisher invaded privacy of a newsworthy person by maliciously disclosing information), a fact which suggests that other forms of tortious speech may be unprotected under appropriate circumstances. Second, there is precedent for imposing negligence liability on a member of the press when physical injuries result from its publication. *See Clift v. Narragansett Television*, 688 A.2d 805 (R.I.1996) (despite the First Amendment's guarantee of freedom of speech and press, there is a right to recover in negligence when a member of the press negligently causes the suicide of a person); *Weirum v. RKO General, Inc.*, 15 Cal.3d 40, 123 Cal.Rptr. 468, 539 P.2d 36, 40 (1975) (rejecting argument that broadcaster was insulated from liability in wrongful death suit because of the First Amendment, and

stating that such an argument is "clearly without merit;")[9]; *but see Olivia N. v. National Broad. Co.*, 126 Cal.App.3d 488, 495, 178 Cal.Rptr. 888 (1981) (although plaintiff brought suit in negligence, she needed to meet the incitement test).

*DeFilippo*, the case relied on by the NHF in support of its argument, is weak precedent in light of a later case decided by the same court. *See Clift*, 688 A.2d 805. The *Clift* court reviewed *DeFilippo's* analysis but declined to shield a reporter's speech on the basis that it did not fall into one of the unprotected categories. Instead, the court noted that the press "has no special immunity from the application of general laws." *Clift*, 688 A.2d at 811 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 683, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) and specifically stating that the press deserves the same and not less protection than the law provides to others). Recognizing the value of free speech, the court still concluded with the following statement:

> That is not to say that we believe the press is immune from liability for its negligence or that the First Amendment is an impenetrable shield from a negligence claim. To the contrary, we believe that notwithstanding First Amendment constitutional protections, everyone, including the press, should be answerable for unprivileged negligent actions that proximately result in suicide.

*Id.* 688 A.2d at 811 (concluding that the trial judge erred in granting summary judgment to defendant reporter); *see also Weirum*, 123 Cal.Rptr. 468, 539 P.2d at 40 ("The First Amendment does not sanction the infliction of physical injury merely because achieved by word, rather than act."); *see also Risenhoover v. England*, 936 F.Supp. 392, 405

8. At least one state has decided that negligence is insufficient. *See Virelli v. Goodson–Todman Enterprises*, 142 A.D.2d 479, 487, 536 N.Y.S.2d 571 (N.Y.App.Div.1989) (New York requires "gross irresponsibility" in the case of a defamation suit brought by a private plaintiff alleging both reputational and emotional injuries).

9. The NHF argues that *Weirum* did not establish a "general principle carving an exception to First Amendment protection." *See also Olivia N. v. National Broad. Co.*, 126 Cal.App.3d 488, 496,

178 Cal.Rptr. 888 (1981) (stating that *Weirum* "must be understood in light of the particular facts of that case") According to the NHF, the *Weirum* court found the broadcaster liable under the incitement test.

We disagree with the NHF's interpretation of *Weirum*. The incitement test was not mentioned or analyzed in the opinion; the issue before the court was whether plaintiff's negligence action was barred by the First Amendment.

(W.D.Tex.1996) ("Practically every tort claim involves some form of communication. A plaintiff is not divested of a cause of action by the First Amendment merely because a tortfeasor speaks."). To reach this conclusion, the court balanced the right of the individual to recover for the injury against the right of the press to be free from overly broad regulation of speech. *Id.* Although it did not cite *Gertz,* the *Clift* court essentially used the same balancing analysis used by *Gertz.*

As we shall see in the following section, a balancing analysis of the competing interests present in this case leads to the conclusion that the NHF may be subject to negligence liability. *See infra* II. We reject the NHF's contention that the First Amendment entitles it to absolute protection.

## II. *Liability for Misstatements*

In regard to plaintiffs' allegations of negligent mistakes in the NHF's publications, the NHF argues that liability cannot be imposed for misstatement alone. The NHF quotes a passage from *New York Times* saying that "erroneous statement is inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" *New York Times,* 376 U.S. at 271–72, 84 S.Ct. 710 (quoting *NAACP v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). The NHF believes this part of the *Times* opinion precludes negligence liability based solely on errors in publications and should be read as imposing a "calculated falsehood" requirement. *See Time,* 385 U.S. at 390, 87 S.Ct. 534 (stating that newsworthy person must prove a "calculated falsehood" when suing for invasion of privacy). Since "[p]laintiffs have not alleged, and cannot prove, that the NHF published 'calculated falsehoods' to its chapters or to the hemophilia community ... they cannot circumvent the NHF's First Amendment rights." Defendant's Memorandum in Support of Summary Judgment, at p. 9; *see also Tumminello v. Bergen Evening Record, Inc.,* 454 F.Supp. 1156, 1159 (D.N.J.1978) (rejecting negligent misrepresentation claim because the state "could not, consistent with the requirements of the First Amendment, impose liability for a negligently untruthful news story ... Recovery may be had at best only for knowing or reckless falsehood.") (citing *Time* ); *Gutter v. Dow Jones, Inc.,* 22 Ohio St.3d 286, 490 N.E.2d 898, 901 (1986) (quoting *Tumminello* approvingly).

■ The problem with the NHF's argument is that it does not explain why a specific standard articulated in the context of a public figure's ability to recover under libel and invasion of privacy theories applies to this case. The libel and privacy cases did not articulate a broad standard for cases where a defendant is sued for misstatements of fact. Instead, those cases were context-specific, applying only to libel suits brought by public figures. *Time,* 385 U.S. at 390–91, 87 S.Ct. 534 (applying *New York Times* privilege to invasion of privacy context was not a "blind application" of *New York Times* but a decision reached "only by applying [the First Amendment principles in *New York Times* ] in this discrete context").

Moreover, as subsequent cases have made clear, *New York Times* sought to reconcile First Amendment values with the need to provide wronged individuals with redress for their injuries. *See Gertz,* 418 U.S. at 343, 94 S.Ct. 2997 (discussing *New York Times* ). Because the calculus of interests may vary in different contexts, different standards, including simple negligence, could be sufficient for liability. *See Gertz,* 418 U.S. at 346, 94 S.Ct. 2997 (declining to apply the *New York Times* standard when the defamation plaintiff is a private individual); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 758–59, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (declining to apply the standard articulated in *Gertz* to punitive damages where the interests at stake were different). So, while the stringent "calculated falsehood" requirement may be appropriate when redressing dignitary injuries in defamation and privacy actions brought by public figures, it might not be appropriate when considering redress for the physical injuries that are alleged here.

In this case, the interest of society in providing redress for the grave injuries alleged should be weighed against the danger

of chilling the NHF's communications. Here, the chilling effect may be greater because of the large number of claimants. Two courts have found this greater chilling effect to be unacceptable. *Tumminello* reasoned that

> Accuracy in news reporting is certainly a desideratum, but the chilling effect of imposing a high duty of care on those in the business of news dissemination and making that duty run to a wide range of readers or TV viewers would have a chilling effect which is unacceptable under our Constitution.

454 F.Supp. at 1160; *Gutter*, 490 N.E.2d at 901 (quoting this passage from *Tumminello*). Another authority cautions against imposing liability on newspapers "to all the world and not just a limited class" and expresses concern about "nearly limitless liability." 58 AMERICAN JURISPRUDENCE 2d § 10 (1989).

We are not persuaded that this potential chilling effect outweighs the public interest in redressing the kinds of injuries alleged here. For one reason, liability here would not extend to "all the world." The facts of this case involve an organization supplying information to its known membership and, by extension, to the limited community of persons suffering from hemophilia. Moreover, this case involves injuries that are different in nature and gravity from the injuries complained of in *Gutter* and *Tumminello*. *Gutter* involved a plaintiff complaining of a $1,692 financial loss caused by reliance on the Wall Street Journal's negligent and inaccurate report about certain bonds.[10] *Gutter*, 490 N.E.2d at 902; *see also Tumminello*, 454 F.Supp. at 1159 (plaintiff complaining of emotional injuries suffered as a result of relying on erroneous report of a legal ruling to conclude that his murder indictment would have to be dismissed). The *Gutter* court recognized the possibility of "distinguishable factu-

al settings" in other areas of First Amendment law, *Gutter*, 490 N.E.2d at 899, and noted that the First Amendment is not a complete bar to negligent misstatement actions. *Id.* 490 N.E.2d at 900 ("Recently, however, a growing number of courts have demonstrated a willingness to extend liability for negligent misrepresentation in special cases.").

It is essential to recognize the exact nature of the interests being asserted in this litigation. On the one hand, there is the interest of the plaintiffs in redressing serious personal injury and death caused by reliance on erroneous information concerning the safety of medical products. On the other hand, there is the interest of the defendant in being immune from liability for *negligent* communication of misinformation that has resulted in serious injury or death. The litigation presents no question as to whether there should be liability for erroneous communications which are not negligent or which do not cause serious injury.

 Medical and scientific opinions can differ, of course, and there is often a wide range of opinions on a particular medical question. It is traditional in negligence law to distinguish between negligence and errors in judgment, with no liability arising from the latter. But it is also traditional for liability to be imposed upon medical practitioners who fail to use ordinary care in arriving at recommendations that proximately cause injury to patients. The recommendation is a form of expression, since it can be conveyed only orally or in writing, but the First Amendment has never been thought to bar an action for medical malpractice based on such written or spoken expression in a medical context. We see no material difference between such an action and the claims presented here.

---

**10.** *Gutter* is not the only court willing to extend First Amendment protection to business publications being sued for negligently causing financial loss by providing false and misleading information. *See Ginsburg v. Agora, Inc.*, 915 F.Supp. 733, 739–40 (D.Md.1995) (refusing to impose tort liability on defendants for alleged negligent misstatements contained in an investment letter, in part because of the First Amendment); *Daniel v. Dow Jones & Co.*, 137 Misc.2d 94, 520 N.Y.S.2d 334 (1987) (First Amendment, among other things, counseled against allowing subscriber to an on-line financial service to bring action alleging false and misleading information was provided). These cases are interesting to the extent they indicate a way of balancing First Amendment values with the value of providing redress for financial losses, but they do not address the interests at issue here.

The situation would be entirely different if plaintiffs were seeking to impose strict liability upon the NHF for its communications. In that event, the First Amendment would surely be implicated and we would be persuaded by the NHF's argument that there must be open and candid public debate on all medical issues and that the courts should not inhibit nonprofit organizations from contributing to that debate. But the argument is not apposite to negligence liability. In seeking to avoid liability altogether, even for negligent conduct, the NHF simply fails to recognize the interests protected by negligence law (in general or in this particular case) or the need to balance those interests against the values of free speech.

We conclude that negligence law, a law of general applicability, provides a constitutionally acceptable accommodation between the competing interests asserted here, and that the First Amendment does not protect the NHF from liability for the negligent acts and omissions alleged by the plaintiffs in this consolidated litigation.[11]

### III. *Whether the NHF is Entitled to a Qualified Privilege Because it was Communicating about Matters of Public Concern*

■ The final matter requiring consideration is the NHF's argument that it "is entitled to First Amendment protection from tort liability when communicating information and opinions to its chapters regarding issues of public concern." Defendant's Memorandum in Support of Summary Judgment, at pp. 2–3. The NHF suggests that "recent developments in First Amendment law emphasize that expressions about matters of public concern are entitled to protection." Defendant's Memorandum in Support of Summary Judgment, at p. 8. However, the NHF cites no authority for such a privilege

and offers scant explanation as to how it would work.

A review of the relevant cases demonstrates that the NHF is not entitled to a privilege solely because its publications were matters of public concern. We begin with *New York Times*, in which an emphasis on public concern could be seen. In that case, the Supreme Court held that the First Amendment protects a newspaper from liability for defamatory publications about the official conduct of a public official unless the defamatory matter was published with actual malice, which is a knowing falsity or reckless disregard for the truth. 376 U.S. 254, 84 S.Ct. 710. One of the reasons the newspaper was given a qualified privilege was that the advertisement in question was "an expression of grievance and protest on one of the major public issues of our time." *Id.* 376 U.S. at 271, 84 S.Ct. 710.

Three years later, the Court again emphasized the importance of the subject matter of the communications at issue. This occurred when the Court applied the *New York Times* privilege to the tort of invasion of privacy where the subject of the publication was "newsworthy." *Time, Inc. v. Hill,* 385 U.S. 374, 386 (1967). A slightly analogous shift in the law of defamation occurred when, later in the same term, the Court extended the scope of the *New York Times* privilege from "public officials" to "public figures" in *Curtis Pub'g Co.,* 388 U.S. at 134 (holding that the New York Times privilege is available to publishers in libel actions instituted by persons "who are not public officials, but who are 'public figures' and involved in issues in which the public has a justified and important interest"). Several years later, a four-justice plurality concluded that the *New York Times* privilege should extend to defamatory falsehoods relating to private persons if the statements concerned "matters of public or general concern." *Rosenbloom v. Metrome-*

11. The NHF argues that the potentially greater chilling effect specifically precludes any theory based on the Restatement (2d) of Torts (as opposed to plaintiffs' non-Restatement theories such as breach of fiduciary duty and concert of action). To be clear, we reject this argument.

And while we are on the subject of tort law, we point out that the determination of whether First

Amendment protection exists is different from the determination of whether a duty exists in tort law. The issue before the court is not whether a duty existed in this situation, it is whether and to what extent the NHF is protected by the First Amendment. The cases the NHF cites that concern only the question of duty in tort law are inapposite.

*dia, Inc.*, 403 U.S. 29, 44 (1971) (plurality opinion joined by concurrence). So the doctrine of "public concern" (or "newsworthiness") appeared to be viable in the early 1970's.

But soon thereafter the Supreme Court emphatically rejected the doctrine of public concern set forth by the *Rosenbloom* plurality. Gertz v. Robert Welch, Inc., 418 U.S. 323, 346 (1974). *Gertz* rejected the *Rosenbloom* plurality view for two reasons. First, extending the *New York Times* privilege to all matters of public concern would abridge the state interest in providing a legal remedy for defamatory falsehood "to a degree we find unacceptable." *Gertz*, 418 U.S. at 346, 94 S.Ct. 2997. Second, it would be too difficult for judges to decide on an "ad hoc basis" when publications address issues of "general or public interest." *Id.* (further stating that "[w]e doubt the wisdom of committing this task to the conscience of judges."). And again in 1979, the Supreme Court repudiated the newsworthiness test as a determinant for the applicability of the *New York Times* privilege. *Wolston v. Reader's Digest Assoc., Inc.*, 443 U.S. 157, 167–68, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979) ("To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in *Rosenbloom* .... We repudiated this proposition in *Gertz* and in *Firestone*, however, and we reject it again today. A libel defendant must show more than mere newsworthiness to justify application of the demanding burden of *New York Times*.").

A plurality opinion in a later case, however, suggested that the doctrine of public concern is not irrelevant in a First Amendment inquiry. In *Dun & Bradstreet*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593, a construction contractor brought a defamation action against a credit reporting agency that issued false credit reports to the contractor's creditors. The issue before the court was whether the contractor could recover presumed

and punitive damages where the defamatory statements did not involve matters of public concern. *Id.* 472 U.S. at 751, 105 S.Ct. 2939. A three-justice plurality concluded that the plaintiff could recover those damages, because, unlike the situation in *Gertz*, the communications at issue in *Dun & Bradstreet* were not of public concern. *Id.* 472 U.S. at 762, 105 S.Ct. 2939. The plurality did not reject *Gertz* or *Wolston*'s view of the public concern doctrine in defamation cases; indeed, it applied *Gertz*'s balancing test. But in the context of balancing the competing interests, it noted that the speech at issue there deserved less protection than the speech at issue in *Gertz* because the credit reports were not of public concern. *Id.* 472 U.S. at 758–59, 105 S.Ct. 2939 (stating, at 756, that nothing in *Gertz* "indicated that the same balance would be struck regardless of the type of speech involved.").

█ What is clear from this review is that libel suits are not automatically subject to the heightened standard articulated by *New York Times* simply because they involve matters of public concern. So, to the extent the NHF argues that we adopt a qualified privilege like that in *New York Times* solely because the speech at issue in this case was of "public concern," we reject that argument.

Indeed, *Dun & Bradstreet* reaffirmed that the competing interests must be balanced, with proper weight being given the type of speech involved. *Id.* 472 U.S. at 757, 105 S.Ct. 2939 (applying this test specifically to a defamation case involving a private plaintiff). We believe we have given the NHF's speech the weight it deserves and conclude that the balance favors the governmental interest in remedying negligently-inflicted physical injuries.

█ The Supreme Court cases addressing the public concern doctrine have involved defamation, not negligence.[12] But as noted

---

12. The other type of cases discussing the doctrine of "public concern" are those involving the free speech rights of government employees and contractors. The First Amendment prohibits a retaliatory discharge when a public employee speaks on "matters of public concern." *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75

L.Ed.2d 708 (1983), extended to government independent contractors in *Board of County Comm'rs, Wabaunsee County v. Umbehr*, 518 U.S. 668, 685, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). But the importance attached to matters of "public concern" in the area of government employment does not mean that notions of "pub-

earlier, we see no reason not to apply the analysis of *Gertz* and its progeny to this case. *See infra* I.

## IV. *Freedom Not to Speak*

 In its reply brief, and in response to the plaintiffs' argument that the NHF had a duty to speak concerning several matters,[13] the NHF cites two Supreme Court cases and argues that the First Amendment provides a right *not* to speak. We reject this argument for several reasons. First, the two cited cases are from areas of law not analogous to this one. *See Riley v. National Fed'n of the Blind of N.C.*, 487 U.S. 781, 791, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (invalidating North Carolina law requiring professional fund raisers to disclose to potential donors the percentage of charitable funds collected during the previous 12 months that they actually gave to the charity); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (invalidating Florida statute compelling newspaper to print responses written by political candidates to editorial criticism; concurrence noting that the Court's opinion "addresses only 'right of reply' statutes" (Brennan, J., concurring, p. 258)). Second, there is no case authority for the proposition that the First

Amendment provides immunity for defendants in failure to warn cases. Third, adopting the NHF's view of the First Amendment would ignore decades of tort law, dating back to at least 1892, holding that manufacturers can be liable for failing to warn consumers about dangers of their products. *See Schubert v. J.R. Clark Co.*, 49 Minn. 331, 51 N.W. 1103, 1104 (1892) ("If the defendant knowingly delivered such an article for the plaintiff's use, it was its duty to warn him of the danger by disclosing the hidden defects; and neglect of that duty would constitute actionable negligence."). We see no principled basis on which the duty to warn could be imposed on manufacturers while organizations such as the NHF would be exempted on First Amendment grounds.

### CONCLUSION

Defendant's motion for summary judgment is denied.[14] Because there are no issues appropriate for summary determination in defendant's favor, defendant's motion for summary adjudication of major issues is also denied.

---

lic concern" should be exported to other areas of the First Amendment world. Nowak and Rotunda comment that

> [i]t is one thing to decide what is a matter of public concern for the purpose of protecting a government employee from discharge—where the Court must tie in the type of speech engaged in to the effective functioning of the office—and quite another thing for the Court to engage in the much more open-ended task of trying to decide what is a "matter of public concern" [in the context of defamation].

Rotunda & Nowak § 20.35.

One court has apparently created a First Amendment qualified privilege for publishers being sued for negligence. *See Hyde v. City of Columbia*, 637 S.W.2d 251 (Mo.Ct.App.1982). *Hyde* was a negligence suit by an abduction victim against a newspaper, alleging negligent publication of plaintiff's name and address while her assailant was still at large. The complaint alleged that the publication of her name and address identified her to the unknown assailant, who then terrorized her on seven different occasions. *Id.* 637 S.W.2d at 253. The court held that the newspaper was entitled to a First Amendment privilege if (1) the publication at issue was a "matter of public concern," and (2) if

the "occasion is one to which a qualified privilege extends." *Id.* 637 S.W.2d at 267. The second prong appears to depend on whether the interest in free speech outweighs the interest in redress through tort law, although the opinion was not clear on this. *Id.*

We do not follow *Hyde* because, as we have explained above, we believe the balance here tips in favor of redress for plaintiffs' injuries under the law of negligence.

13. Plaintiffs argue that the NHF had: (1) a duty to disclose the financial and other relationships of its board with the blood products manufacturers; (2) a duty to disclose all potential risks involved in using the factor concentrates; (3) a duty to warn hemophiliacs about the risk of the sexual transmission of AIDS; and (4) a duty to disclose statements by a certain Dr. Bruce Evatt.

14. The NHF broke down plaintiffs' case into its various causes of action and theories: (1) concert of action; (2) breach of fiduciary duty; and (3) various theories brought under the Restatement (2d) of Torts. To be clear, we hold that the First Amendment is not a bar to any of the causes of action or theories.